EUREKA RESOURCES, LLC, Plaintiff,

v.

RANGE RESOURCES–APPALACHIA, LLC, a Delaware entity, and Range Resources Corporation, a Delaware Corporation, Defendants.

C.A. No. N12C–07–220 JRS CCLD.

Superior Court of Delaware, New Castle County.

Submitted: Nov. 9, 2012.
Decided: Nov. 27, 2012.

Francis G.X. Pileggi, Esquire and Penelope B. O'Connell, Esquire, Eckert, Seamans, Cherin & Mellott, LLC, Wilmington, Delaware, Attorneys for Plaintiff.

Geoffrey G. Grivner, Esquire, Buchanan Ingersoll & Rooney, PC, Wilmington, Delaware; Gregory J. Krock, Esquire and Jordan Webster, Esquire, Buchanan Ingersoll & Rooney, PC, Pittsburgh, Pennsylvania, Attorneys for Defendants.

SLIGHTS, J.

## I.

A dispute arising under a Pretreatment and Disposal Agreement (the "Agreement") between plaintiff, Eureka Resources, LLC ("Eureka"), and defendants, Range Resources–Appalachia, LLC ("Range") and Range Resources Corpora-

tion ("RRC"), has spawned both breach of contract and related tort claims. Defendants have moved to dismiss the tort claims. As to the tortious interference with contract claim, defendants invoke the settled principle of Texas law that a parent corporation cannot tortiously interfere with its subsidiary's contracts. Applying this principle, defendants argue that the target of Eureka's tortious interference claim, RRC, as parent of its wholly-owned subsidiary, Range, could not tortiously interfere with Range's contract with Eureka as a matter of law. According to defendants, because the tortious interference claim fails as a matter of law, Eureka's derivative civil conspiracy claim likewise must fail.

Eureka argues that defendants have glossed over the choice of law analysis in order to reach the conclusion that Texas law, more favorable to RRC's position, applies here. According to Eureka, Pennsylvania has the most significant relationship to this controversy and, therefore, Pennsylvania law should apply. In this regard, Eureka disagrees with defendants' contention that, when considering the viability of an intentional tort claim, the Court should defer to the law of the state where the tortious conduct allegedly occurred (in this case Texas). Instead, Eureka contends that Delaware courts will engage in a full choice of law analysis under the Restatement (Second) of Conflicts even in cases where the claim at issue is an intentional tort. A proper choice of law analysis, says Eureka, points to Pennsylvania law which does not, says Eureka, *ipso jure* preclude claims that a parent has tortiously inter-

fered with its subsidiary's ability to perform a contract.

After careful consideration of the parties' submissions and presentations at oral argument, the Court concludes that Pennsylvania law applies to this dispute. Under Pennsylvania law, it is premature at this stage of the litigation to determine whether Eureka's tortious interference claim is viable as a matter of law. Accordingly, defendants' motion to dismiss must be **DENIED**.

## II.

### A. The Parties

Eureka is a Delaware limited liability company with its principal place of business in Pennsylvania.[1] Range and RRC are Delaware business entities with principal places of business in Texas.[2] RRC is the publicly-traded parent of its wholly-owned subsidiary, Range.[3]

### B. The Agreement

Eureka and Range entered into the Agreement on August 6, 2008, for a term of five years.[4] Pursuant to the Agreement, Eureka was to provide water pretreatment and disposal services for wastewater produced from drilling, hydraulic fracturing, and gas well producing sites operated by Range in Pennsylvania.[5] In exchange for this service, Range agreed to pay Eureka a graduated per-gallon fee for the wastewater that it treated plus a minimum monthly charge referred to as a "reservation fee." This fee was intended to compensate Eureka for maintaining the capacity to treat Range's wastewater.[6]

1. Compl. at ¶ 1.

2. *Id.* at ¶¶ 2–3.

3. *Id.*

4. *Id.* at ¶ 5.

5. *Id.*

6. *Id.* at ¶¶ 5–7. The monthly reservation fee increased after the first year. It would not be triggered if Range delivered more than a contractually-determined minimum gallons per month for pretreatment. *Id.*

## C. The Dispute

In 2010 and 2011, disputes arose between the parties regarding the extent of Range's obligation to pay reservation fees.[7] Range took the position that it was not obliged to pay a fee for capacity that it did not wish to reserve.[8] Eureka disagreed. In addition to maintaining that Range was breaching the Agreement by not paying reservation fees, Eureka also alleged that RRC was tortiously interfering with Range's performance of the Agreement by intentionally withholding funds from Range with which Range could pay the reservation fees.[9]

Eureka initiated this lawsuit in July, 2012, and has asserted the following claims: (1) Count I-breach of contract; (2) Count II-unjust enrichment; (3) Count III-promissory estoppel; (4) Count IV-tortious interference with contract (against RRC); (5) Count V-civil conspiracy (against RRC and Range); and (6) Count VI-declaratory judgment. Defendants have moved to dismiss Counts IV and V.

## III.

Although the parties offer differing views of the substance of Texas and Pennsylvania law regarding tortious interference with contract, the essence of their dispute lies in their differing views regarding the focus of Delaware's choice of law analysis when considering the proper law to apply to intentional tort claims. Defen-

dants argue that Delaware places great (almost presumptive) weight on the *lex loci delicti* (the law of the site of the tort) when determining choice of law for intentional tort claims. Eureka, on the other hand, argues that the defendants' emphasis upon *lex loci delicti* is misplaced and contrary to the now-settled law of Delaware.

The parties' fundamental disagreement regarding the contours of Delaware's choice of law analysis is significant here as both parties appear to appreciate that Eureka's tortious interference of contract claim stands a better chance of success under Pennsylvania law than Texas law. Mindful of this dynamic, the Court will first consider the choice of law before determining the viability of Eureka's tort claims.

## IV.

A motion to dismiss under Rule 12(b)(6)[10] presents the question of "whether a plaintiff may recover under any reasonably conceivable set of circumstances susceptible of proof under the complaint."[11] When considering a motion to dismiss, the Court must read the complaint generously, accept all well-pleaded allegations as true, and construe them in a light most favorable to the plaintiff.[12] A complaint is "well-plead" if it puts the opposing party on notice of the claim being brought against it.[13] Dismissal is warranted only when "under no reasonable inter-

---

7. *Id.* at ¶¶ 12–16.

8. *Id.* at ¶¶ 14–18.

9. *Id.* at ¶¶ 43–44.

10. Del.Super. Ct. Civ. R. 12(b)(6)(allowing for dismissal of a complaint for "failure to state a claim upon which relief may be granted.").

11. *Browne v. Robb,* 583 A.2d 949, 950 (Del. 1990)("The complaint sufficiently states a

cause of action when a plaintiff can recover under any reasonably conceivable set of circumstances susceptible of proof under the complaint.").

12. *In re Tri–Star Pictures, Inc. Litig.,* 634 A.2d 319, 326 (Del.1993) (holding that the reviewing court must accept the allegations of the complaint as true) (citation omitted).

13. *Precision Air v. Standard Chlorine of Del.,* 654 A.2d 403, 406 (Del.1995).

pretation of the facts alleged could the complaint state a claim for which relief might be granted." [14]

## V.

### A. Choice of Law

■ When more than one state's law might apply to a dispute (here Texas, Pennsylvania and possibly Delaware), the Court will apply Delaware choice of law standards to determine which law shall apply.[15] Prior to 1991, the "state of [Delaware] law in [the] area [of choice of law was] unsettled." [16] In *Travelers Indem. Co. v. Lake*, however, the Supreme Court of Delaware made clear that Delaware courts shall no longer apply "the *lex loci* doctrine" when determining choice of law in tort cases.[17] Rather, Delaware courts are to frame the choice of law analysis around the Restatement (Second) of Conflicts' "most significant relationship" doctrine in both contract and tort disputes.[18]

The defendants have cited to cases from the United States District Court for the District of Delaware, two decided prior to *Lake* and one after, in support of the proposition that Delaware courts will apply the law of the state where the alleged tort was committed when determining choice of law for intentional torts claims.[19] These cases focus on the state of Delaware law prior to *Lake* and do not capture Delaware's shift away from the inflexible *lex loci* doctrine to the fact-driven most significant relationship test in both contract and tort cases.[20] Since *Lake*, Delaware courts addressing choice of law for tortious interference with contract claims have engaged in a traditional "most significant relationship" analysis without placing particular or *per se* emphasis upon the *lex loci delicti* factors. To be clear, the *lex loci delicti* factors are still to be considered as part of the broader Restatement (Second) of Conflicts analysis.[21] They are to be given no

14. *Hedenberg v. Raber*, 2004 WL 2191164, at *1 (Del.Super. Aug. 24, 2004).

15. *See Travelers Indem. Co. v. Lake*, 594 A.2d 38, 47 (Del.1991).

16. *Id.* at 41.

17. *Id.* at 43, 47.

18. *Id.*

19. Def. Opening Brief, at 6 (citing *Johnston Assoc., Inc. v. Rohm & Haas Co.*, 560 F.Supp. 916 (D.Del.1983); *Hill v. Equitable Trust Co.*, 562 F.Supp. 1324 (D.Del.1983); *Christ v. Cormick*, 2007 WL 2022053 (D.Del. Jul. 10, 2007)).

20. *See Johnston Assoc.*, 560 F.Supp. at 918 ("The claim of tortious interference with plaintiff's contractual rights is, of course, a tort claim. Consequently, the Court *must* utilize a *lex loci delicti* analysis")(emphasis supplied); *Hill*, 562 F.Supp. at 1334 ("Delaware courts, when confronted with a substantive choice of law situation in a tort action, will apply the law of *lex loci delicti*, *i.e.*, the law of

the state where the tort or injury occurred."); *Christ*, 2007 WL 2022053, at *6 ("Generally, in tort cases, Delaware courts have followed 'the principle of *lex loci delicti*, and [have] appl[ied] the law of the place of the injury ... [except][i]n the case of intentional torts [where the] court [will] apply the substantive law of the state [] where the defendant's wrongful conduct primarily occurred.' ")(citing pre-*Lake* decisions as authority). *But see Integral Resources (PVT) Ltd.*, 2005 WL 3134068, at *1 (3d Cir. Nov. 23, 2005)(applying Delaware law and noting that "Delaware applies the 'most significant relationship test' " in all tort cases).

21. *See e.g.* Restatement (Second) of Conflicts, § 145(2)(a), (b) (1971); *UbiquiTel Inc. v. Sprint Corp.*, 2005 WL 3533697, at *3–4 (Del. Ch. Dec. 19, 2005) (applying a full § 145 analysis to determine choice of law for a tortious interference with contract claim); *Horizon Pers. Commun., Inc. v. Sprint Corp.*, 2006 WL 2337592, at *25 (Del.Ch. Aug. 4, 2006) (same); *Soterion Corp. v. Soteria Mezzanine Corp.*, 2012 WL 5378251, at *12 (Del.Ch. Oct. 31, 2012) (same).

greater or lesser weight than the other factors, however, absent clear direction to the contrary within the Restatement itself.[22] This approach is consistent with the now-settled law of Delaware and will be followed here.

"The Second Restatement contemplates a two-step process in which the court (1) chooses a presumptively applicable law ...; and (2) tests this choice against the principles of § 6 in light of relevant contacts identified by general provisions like § 145 (torts) and § 188 (contracts)."[23] As *Morgan* suggests, the Restatement (Second) of Conflicts' most significant relationship analysis does incorporate "presumptive rules" in certain cases, such as personal injury tort cases in which, per § 146, the law of the place of injury presumptively applies, or "service contract" breach of contract cases in which, per § 196, the law of the place where the services are to be performed presumptively applies.[24] In this case, however, the parties agreed at oral argument that no "presumptive rule" applies to Eureka's tortious interference with contract claim. Accordingly, the Court will look only to §§ 6 and 145 when determining choice of law.

The Restatement (Second) of Conflicts § 6 "lists the following relevant choice of law considerations"[25] that must inform all choice of law determinations: (a) the needs of interstate and international systems; (b) the relevant policies of the forum; (c) the relevant policies of other interested states; (d) the protection of justified expectations; (e) the basic policies underlying the particular field of law; (f) certainty, predictability and uniformity of result; and (g) ease in the determination and application of the law to be applied.[26] In tort actions, the court applies these broad considerations with four specific contacts in mind, as per § 145:(1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation and place of business of the parties; and (4) the place where the relationship, if any, between the parties is centered.[27] As to these contacts, they must "be evaluated according to their relative importance with respect to the particular issue."[28]

The defendants argue that the relevant factors point to Texas law; Eureka wants Pennsylvania law to apply, and for good reason. Texas does not recognize a claim that a parent tortiously interfered with its subsidiary's performance of a contract;[29] Pennsylvania will allow the claim in certain

---

**22.** *Travelers Indem. Co.,* 594 A.2d at 47–48.

**23.** *Kelco Metals, Inc. v. Morgan,* 2010 WL 1427583, at *4 (N.D.Ill. April 5, 2010).

**24.** *See Id.* (providing a clear explanation of the manner in which the Restatement (Second) of Conflicts "presumptive rules" should be applied).

**25.** *Travelers Indem. Co.,* 594 A.2d at 47.

**26.** Restatement (Second) of Conflicts § 6 (1971).

**27.** *Id.* at § 145.

**28.** *Id.* at § 145(2). *See also Travelers Indem. Co.,* 594 A.2d at 48 ("[T]he Restatement test does not authorize a court to simply add up the interests on both sides of the equation and automatically apply the law of the jurisdiction meeting the highest number of contacts listed in Sections 145 and 6. Section 145 has a qualitative aspect.").

**29.** *See Cleveland Reg. Med. Ctr., L.P. v. Celtic Props., L.C.,* 323 S.W.3d 322, 348 (Tex.Ct.App.2010)(holding that "a parent corporation is incapable of tortuously [sic] interfering with its subsidiary's contracts.").

situations.[30] Having identified the stakes of the determination, the Court now undertakes the choice of law analysis.

### 1. Place of Injury

Eureka alleges that RRC's interference with the Agreement caused injury to Eureka in Pennsylvania, where Eureka maintained its principal place of business and where it performed the services required under the Agreement.[31] This position is consistent with the general notion that "[t]he effect of [a] loss, which is pecuniary in its nature, will normally be felt most severely at the plaintiff's headquarters or principal place of business."[32] The place of injury is Pennsylvania and this factor favors the application of Pennsylvania law.

### 2. The Place of the Injury–Causing Conduct

RRC, the target of the tortious interference with contract claim, is incorporated in Delaware but operates, as does Range, in Texas.[33] Although Eureka does not allege where RRC made the determination to "intentionally withh[o]ld funds from Range that were necessary to make the required payments to Eureka pursuant to the Agreement,"[34] one reasonably can assume, at this stage of the proceedings, that the decision was made at RRC corporate headquarters in Texas.[35] Thus, this factor favors the application of Texas law. In this instance, however, this factor will not "be given particular weight" given that the injury resulting from RRC's allegedly tortious conduct occurred in only one state.[36]

### 3. Domicile, Residence, Place of Incorporation and Place of Business of the Parties

According to the complaint, Eureka is a Pennsylvania limited liability company, Range is a Delaware limited liability company and RRC is a Delaware corporation.[37] While these contacts are relevant, "a corporation's principal place of business is a more important contact than the place of incorporation."[38] Here, Eureka's principal place of business is in Pennsylvania; the defendants' principal places of business are in Texas.[39] This factor is a wash.[40]

---

**30.** *See Shared Commun. Serv. Of 1800–80 JFK Blvd., Inc. v. Bell Atlantic Prop., Inc.*, 692 A.2d 570 (Pa.Super.1997)(holding that parent can commit actionable tortious interference with contract in certain circumstances).

**31.** Compl. at ¶¶ 1, 5.

**32.** Restatement (Second) of Conflicts, § 145(2) cmt. f (1971). *See also UbiquiTel Inc.*, 2005 WL 3533697, at *3 (same); *Pittway Corp. v. Lockheed Aircraft Corp.*, 641 F.2d 524, 528 (7th Cir.1981)("The harm that [plaintiff] suffered and for which it seeks to be compensated was purely economic and as such was sustained in Illinois, where [plaintiff's] principal place of business is located. . . .").

**33.** Compl. at ¶¶ 2, 3.

**34.** *Id.* at ¶ 43.

**35.** Of course, the facts as developed in discovery may prove otherwise.

**36.** *Cf. UbiquiTel Inc.*, 2005 WL 3533697, at *4 ("Where, as here, the injury will occur in more than one state, 'the place where the defendant's conduct occurred will usually be given particular weight in determining the state of the applicable law.' ") (citations omitted).

**37.** Compl. at ¶¶ 1–3.

**38.** Restatement (Second) of Conflicts, § 145(2) cmt. e (1971)(place of business is more important than state of incorporation when "the interest [at issue in the litigation] is a business or financial one, such as in the case of unfair competition [or] interference with contractual relations.").

**39.** Compl. at ¶¶ 1–3.

**40.** Eureka contends that the plaintiff's principal place of business is the most important contact of all of § 145's contacts in cases

#### 4. The Place Where The Relationship Between The Parties Is Centered

The Agreement, which is the genesis of this dispute, called for "Eureka [ ] to provide water pretreatment and disposal services for wastewater [ ] produced from Range's drilling, hydraulic fracturing, and gas well producing sites in Pennsylvania...."[41] No other site is mentioned in or implicated by the Agreement.[42] While it is true that the Agreement is between Eureka and Range, not Eureka and RRC, the tortious interference with contract claim, under either Texas or Pennsylvania law, is predicated upon the existence of a contract the performance with which RRC allegedly interfered.[43] Thus, the Agreement does mark the "center" of Eureka's relationship with both Range and RRC for purposes of the claims Eureka has brought against these defendants in this case. This factor favors application of Pennsylvania law.[44]

#### 5. The Broader § 6 Policy Considerations

Of the seven broad policy considerations recognized in § 6, the Court is satisfied that only the following have any possible relevance here: (2) the relevant policies of the forum; (4) protection of justified expectations; (5) the basic policies underlying the field of law; and (6) certainty, predictability and uniformity of result. They will be considered *seriatim* below.

##### a. Relevant Policies of the Fora

Both Pennsylvania and Texas recognize the common law tort of tortious interference with contract, and it is safe to conclude that both states "have an interest in deterring tortious interference with contract and punishing those who do so interfere."[45] And while it may be said that the interest of the forum in which the allegedly injured party resides and operates may have a greater interest "in protecting its residents from [harm],"[46] this "policy consideration" does not decidedly point to either Texas or Pennsylvania.

##### b. Protection of Justified Expectations

This factor points to Pennsylvania. The Agreement is a Pennsylvania contract in every sense. Eureka was to perform the bargained-for services exclusively in Pennsylvania; Range's drilling operations were in Pennsylvania; and the Agreement incorporates Pennsylvania law with respect to allowable finance charges on late pay-

---

involving economic injury. Eureka Ans. Br. at 7. This is only true, however, in cases "where injury occurs in two or more states." *See* Restatement (Second) of Conflicts, § 145(2) cmt. e (1971). In this case, where Eureka alleges that all of its economic harm was sustained in one state (Pennsylvania, its principal place of business and the state where the Agreement was to be performed), the deference to Eureka's principal place of business called for in comment e to § 145 does not apply.

**41.** Compl. at ¶ 5.

**42.** *Id.* at Ex. 1 (the Agreement, incorporated by reference at ¶ 5).

**43.** *See Id.* at ¶¶ 40–48; *Juliette Fowler Homes, Inc. v. Welch Assoc., Inc.,* 793 S.W.2d 660,

664 (Tex.1990); *Phillips v. Selig,* 959 A.2d 420, 429 (Pa.Super.2008).

**44.** *See* Restatement (Second) of Conflicts, § 145(2) cmt. e (1971) (the place where the parties' relationship is centered will be given more weight when "the place of injury or the place of conduct ... are also located in [that] state."); *Soterion Corp.,* 2012 WL 5378251, at *13 (considering choice of law for a tortious interference with contract claim and finding "that the factor with the greatest importance is [ ] the place where the relationship between the parties was centered.").

**45.** *UbiquiTel Inc.,* 2005 WL 3533697, at *5.

**46.** *Id.*

ments.[47] The allegation is that RRC purposefully interfered with Range's performance of the Agreement.[48] This is not, therefore, a situation where RRC "acted without giving thought to the legal consequences of [its] conduct or to the law that may be applied."[49] Under these circumstances, it was reasonable for all parties to expect that Pennsylvania law would apply.

### c. Policies Underlying The Field of Law

The Court can discern no overriding policy underlying tort law generally, or the law of tortious interference with contract specifically, that would point either to Pennsylvania or Texas. While it is true that the nuances of the laws of Texas and Pennsylvania with regard to tortious interference with contract may lead to different results in this case, depending upon which state's law applies, the parties have pointed to nothing in the underlying policies of the laws of either Texas or Pennsylvania that would suggest that either jurisdiction has an interest in this controversy superior to the other's.

The defendants have suggested that Delaware's federal court, in pre-*Lake* decisions, has recognized that the policy underlying intentional torts is "punitive" rather than "compensatory" and that the punitive aspect of tort law points to the law of the state where the tort occurred.[50] These decisions rely upon the *lex loci delicti* doctrine which is no longer the law of Delaware.[51] Moreover, even if the "policy underlying" most intentional tort claims points to the law of the place of the tort, in the case of a tortious interference with contract, where the resulting injury is purely economic, the "punitive element" identified in *Johnston Assoc., Inc., et al.* is less relevant.[52]

### d. Certainty, Predictability and Uniformity of Result

This factor allows the Court to consider whether either party has engaged in improper forum shopping or to enforce the parties' agreed-upon choice of law.[53] Neither consideration is at issue here.

### 6. The Choice of Law Conclusion

The defendants rest their argument on law that no longer governs the choice of law analysis in Delaware. Absent an applicable "presumption" within the Restatement (Second) of Conflicts that would direct the Court to place particular weight upon a single factor, the Court is obliged to perform a complete choice of law analysis under the most significant relationship framework.[54] Eureka's principal place of business is in Pennsylvania, the Agreement was to be performed in Pennsylvania, and Eureka allegedly was injured in Pennsylvania by RRC's interference with Range's performance of its payment obligations. "Thus, for purposes of the in-

47. Compl. at ¶ 5 (incorporating Agreement, attached as Ex. 1).

48. *Id.* at ¶ 43.

49. Restatement (Second) of Conflicts, § 6, cmt. g (1971)(distinguishing between negligence-based torts and other torts).

50. *See* Defendants Op. Br. at 5–6 (citing *Johnston*, 560 F.Supp. at 918; *Hill,* 562 F.Supp. at 1334–35).

51. *Id. See also Travelers Indem. Co.,* 594 A.2d at 43, 47.

52. *Id.See also UbiquiTel Inc.,* 2005 WL 3533697, at *4 (noting distinction between purely financial or economic injuries and other injuries).

53. *See* Restatement (Second) of Conflicts, § 6 cmt. i (1971).

54. *See Travelers Indem. Co.,* 594 A.2d at 47.

stant motion, the Court will apply the substantive law of Pennsylvania." [55]

## B. The Viability of Eureka's Tort Claims Under Pennsylvania Law

■ Having determined that Pennsylvania law will apply at this stage to determine whether Eureka has stated actionable tort claims, the Court turns to the question of whether a parent can tortiously interfere with its subsidiary's contract as a matter of Pennsylvania law. In *Advent Systems Ltd. v. Unisys Corp.*,[56] the court explained that Pennsylvania law recognizes that one may be "privileged" to interfere with another's contract, for instance in cases when a "defendant acts at least in part to protect some legitimate concern that conflicts with an interest of the plaintiff. . . ." [57] The court went on to apply the law of privilege to determine whether a parent was "privileged" to interfere with a *prospective* contractual relationship involving its corporate subsidiary.[58]

The Third Circuit has also applied the Pennsylvania law of privilege to determine the propriety of a parent's interference with a subsidiary's *existing* contract as well.[59] In *Green*, the court concluded that the trial court properly concluded that the parent was permitted to interfere with its subsidiary's contract because performance of the contract would have "dissipat[ed][ ] the resources of [its] wholly-owned subsidiary. . . ." [60] In making this determination, the court noted that "[t]o decide whether interference in a given case is proper, the court must examine a number of factors and determine 'whether, upon consideration of the relative significance of the factors involved, the conduct should be permitted without liability, despite the effect of harm to another.' " [61] The inquiry is highly fact-intensive.[62]

■ It is clear under Pennsylvania law that there is no *per se* bar to claims that a parent tortiously interfered with its subsidiary's contract. Rather, Pennsylvania law embraces a fact-intensive inquiry as to whether the parent's interference with its subsidiary's contract was "proper" [63] or "privileged." [64] In defendants' view of the complaint, Eureka "has not alleged any facts which (if true) would support a finding that RRC acted wrongfully." [65] Eureka disagrees and points to its allegations that RRC did not act "in good faith" and "acted with scienter" as sufficient under Pennsylvania law to sustain an actionable claim for tortious interference with contract against RRC.[66] Of course, most matters of interpretation are subject to different perspectives. As one famous landlubber who happened to live on an

---

**55.** *UbiquiTel*, 2005 WL 3533697, at *5 (noting that the record on a motion to dismiss is "undeveloped [ ] with respect to many of the factors relevant to the choice of law analysis" and, therefore, holding that the choice of law "conclusion is preliminary only."). The Court shares this view of the record *sub judice* and, therefore, likewise concludes that this choice of law determination must be deemed "preliminary only."

**56.** 925 F.2d 670 (3d Cir.1991).

**57.** *Id.* at 673.

**58.** *Id.*

**59.** *See Green v. Interstate United Mgt. Serv. Corp.*, 748 F.2d 827, 831 (3d Cir.1984).

**60.** *Id.*

**61.** *Id.* (citations omitted).

**62.** *Id.*

**63.** *Id.*

**64.** *Advent Systems Ltd.*, 925 F.2d at 673.

**65.** Defendants Rep. Br. at 6.

**66.** Compl. at ¶ 44, 45.

1242

island once observed: "It's only an island if you look at it from the water." [67] In the context of motions to dismiss under Rule 12(b)(6), however, the Court's perspective must be influenced by the liberal notice pleading standards that are a hallmark of our civil rules, and the deference the Court is obliged to give to plaintiffs when determining whether they have plead viable claims.[68]

It is "reasonably conceivable" that Eureka can prove that RRC improperly interfered with Range's performance of the Agreement. Because Eureka's tortious interference of contract claim is viable as plead, defendants' argument that Eureka's derivative claim of civil conspiracy fails for want of an actionable underlying tort misses the mark.[69] Accordingly, Eureka must be given the opportunity to "prove up" its tort claims in discovery.

## VI.

Based on the foregoing, defendants' motion to dismiss must be **DENIED**.

**IT IS SO ORDERED.**

67. Jaws (Universal Pictures 1975) (Chief Martin Brody to Matt Hooper).

68. *See Central Mort. Co. v. Morgan Stanley Mort. Cap. Holdings, LLC*, 27 A.3d 531, 537 (Del.2011)(strongly reiterating that "the governing pleading standard in Delaware to survive a motion to dismiss is 'reasonable conceivability' that plaintiff can prove a set of facts that would entitle him to relief.").

69. *See Baker v. Rangos*, 229 Pa.Super. 333, 324 A.2d 498, 506 (1974) (discussing elements of a *prima facie* civil conspiracy claim).